Cline v. Richards.

---

George T. Cline v. John E. Richards et al., Executors, etc.

1. LACHES—*When a Bar to Relief.*—A and B entered into a contract in 1868 concerning a sale of land belonging to A, and the land was conveyed in pursuance of such contract in 1870.   A died in 1881 and in 1893 his executors filed a bill against B for an accounting, alleging fraud.

The evidence showed that A had knowledge of the transactions of B with the land, and yet, having such knowledge during all the remaining years of his life, he did nothing. The court decided that he must be held to have acquiesced in such transactions, and that such acquiescence bound his executors.

2. FRAUD—*Notice of—Laches.*—A and B entered into a contract in 1868 concerning a sale of land · belonging to A; in 1870 C filed a bill against A and B to enforce performance of a contract concerning the land made between B and C, and, later in the same year, this suit was dismissed and the land was conveyed by A to C. A died in 1881 and in 1893 his executors filed a bill against B for an accounting, alleging fraud. *Held*, that the knowledge that A had of the pendency of C's suit bound him with knowledge of what the suit was about, or at least bound him to inquire concerning it, and that, if he chose to go on and perform the contract entered into with B, his executors could not, after the lapse of so long a time, obtain an accounting from B on account of transactions between B and C, of which the suit of C gave him notice.

**Bill,** for an accounting. Appeal from the Circuit Court of Cook County; the Hon. ELBRIDGE HANECY, Judge, presiding. Heard in this court at the October term, 1896. Reversed with directions. Opinion filed December 28, 1896.

JOHN C. PATTERSON, attorney for appellant.

JAMES D. ANDREWS, GEORGE M. MILLER and ARTHUR L. GETTYS, attorneys for appellees.

MR. PRESIDING JUSTICE SHEPARD DELIVERED THE OPINION OF THE COURT.

The appellees, as executors of the last will and testament of David G. Evans, deceased, late of Logan county, exhibited their bill in equity against the appellant, the main object of which was to compel an account by the appellant concerning a certain transaction had between the appellant and appellee's testator in regard to an eighty-acre tract of land situated in Cook county, and obtained a decree *in personam* against the appellant for $18,465.65, from which this appeal is prosecuted.

Appellee's testator died in April, 1881, and the original bill herein was filed February 23, 1893. A general demurrer to the original bill was confessed, and the amended bill was filed April 29, 1893.

The contract out of which the controversy has arisen was as follows:

"Contract between George T. Cline and David G. Evans:

In consideration of one dollar in hand paid to me by George T. Cline, of the city of Chicago, county of Cook, and State of Illinois, I do hereby agree, and do hereby grant him exclusive privilege and right to purchase of me, and I do hereby sell said Cline the following described property, to-wit: The W. ½ of the N. E. ¼ of section 32, in township 39, range 13 east of the third principal meridian, lying and situated in Cook county, Illinois, by said Cline or any person he may sell said land to, for $10,000, payments to be made as follows: $2,500 cash, $2,500 in one year, $2,500 in two years, and $2,500 in three years, with interest at ten per cent per annum, to be paid on or before the 1st day of January, 1869. If said Cline can sell or negotiate said property to any person, to any and all amounts over and above $10,000, I do hereby agree to pay him as commission for negotiating sale for me for the property, as the payments are made to me under this agreement.

In witness I have hereto set my hand and seal, this 31st day of October, 1868.

David G. Evans,

George T. Cline.

I have left with said George T. Cline a deed for the conveyance of said property, for him to fill in any name who may purchase the within described land on the terms specified in this agreement, said deed being acknowledged at Lincoln, Logan county, Illinois, the 28th of October, 1868. Consideration of said deed being $12,000; said Cline or any purchaser he may find, to give me a good and sufficient mortgage for the securing of the payments as herein stated. If said sale is not consummated or made by January 1, 1869, said Cline agrees to return said deed and all papers connected with said described land.

David G. Evans,

George T. Cline."

It may be mentioned, incidentally, that the land described in the contract had been purchased by Evans in 1861, and that Cline in the matter of such purchase acted in some respects, at least, as the agent of Evans, and the evidence furnishes considerable presumption that from the time of the purchase until the making of the above contract, Cline was the agent, in Chicago, of Evans, concerning the land; and it seems to have been established that Evans and Cline were distant relatives, and were, from the time of the purchase of the land until Evans' death, on friendly, if not intimate, terms.

The contract of October 31, 1868, seems to be plain enough, and there is no evidence that any fraud was practiced by Cline in the procurement of it, except such as the law might perhaps imply from the circumstance that he had, previous to its execution and delivery to him, authorized a sale of the property, through one Baldwin, to Samuel S. Greeley for $12,000. The record discloses that said Baldwin did, under date of October 22, 1868, execute, in his own name, to Greeley a receipt in the nature of a contract for the sale of the land for said sum payable in installments, wherein it was recited that it was made under "the written authority given him (Baldwin) by George T. Cline  *  *  *  to sell as agent for the owner," the said eighty acres, for which tract Baldwin agreed to procure for Greeley, from the owners, a good and sufficient warranty deed, etc. The Baldwin-Greeley contract, although dated nine days before the Cline-Evans contract, was not recorded until November 2, 1868, and may not have been delivered until the date of its record. Greeley testified that he supposed he recorded it at once.

Whether Evans knew of the contract given to Greeley by Baldwin, or that such a contract was contemplated when he made the contract of October 31st, is not known. There might be some presumption indulged in that he did know of it, or had reason to make inquiry that would have developed it, from the fact that in the last paragraph of the contract he recites that he has delivered to Cline a deed of the prop-

erty, acknowledged three days before the date of the con-
tract, expressing a consideration of $12,000, the price Greeley
was to pay, and had given Cline authority to fill in Cline's
own name or the name of "any purchaser" he might find,
as grantee, and "if said sale is not consummated or made by
January 1, 1869," the deed should be returned.

We do not regard as being of much importance, except
on the question of notice to Evans, the fact that contro-
versies arose between Cline and Greeley, whereby the con-
tract between Baldwin and Greeley was not carried out, nor
the further fact that Greeley subsequently purchased the
premises for $16,000, after he had failed in, or abandoned, a
suit for specific performance begun by him. Such circum-
stances have but little, if any, bearing upon the relative
rights of the parties to this suit, except in so far as they
tend to establish that Evans had knowledge or notice of
what Cline had done.

Evans was a party defendant to the bill for specific per-
formance brought by Greeley, and appeared by solicitor in
the suit.

The solicitor testifies that he was employed by Cline to
defend the suit for Evans and did so, and that he saw Evans
once during the pendency of the suit, and had a conversa-
tion with him concerning the suit, but was not permitted to
testify to the conversation. He also identified a letter that
was written by him to Evans, and although the date of the
letter is not shown by the record, it is manifest from its
contents that it was written while the suit was pending.
Appellant's brief mentions May 28, 1870, as its date, and it
is quite certain from Cline's letter to Evans on June 4, 1870,
that Evans received it before that letter was written.

The letter, so far as it is shown by either the transcript
or the abstract, was as follows:

"MR. D. G. EVANS:   Mr. Greeley can not come to time
and therefore the sale of your land to him has fallen through.
When the offer of $15,000 was made, there was a party who
stood ready to advance him the necessary funds; when a
new arrangement was made on basis of $16,000, this party

withdrew, and Mr. Greeley hoped to carry it through. I tendered him the deed, and this day his counsel was obliged to confess Greeley could not complete. I am of the opinion that it will pay you to hold on to the land, as in time it will be worth much more than $200 an acre.

There is an injunction against you staying the sale and incumbrance of the land, but it can be dissolved. They still cling to the idea that you can be made to come under the contract made by Cline of $12,000. This is folly. Now, my fee of $500 must be paid, and you will at once send me that amount. Cline wrote me when he visited you that you was ready at any time to send me that amount, and now I wish it. I send an affidavit for you to swear to, which you will do and return at once in order that I may move at once and dissolve the injunction. Your property will sell, no doubt, in time, for $200 to $500 an acre, although it will not bring it now. This suit must be got out of the way in order to clear the title, as it prevents any transfer by you. My fees are due, and, before moving further, I wish my money, when I shall at once proceed. I have done a great deal in the case, and have a right to call for my $500. It will pay you to clear the suit out of the way and hold your land. It is a dull time now."

Greeley's suit for specific performance of the Baldwin contract was begun February 12, 1896, and was dismissed October 15, 1870. Greeley testified that the litigation culminated in a settlement in which he agreed to pay $16,000 for the land, instead of $12,000, as agreed with Baldwin.

Just when the settlement took place is not certain, but probably it culminated in July, 1870, for on the fourteenth day of that month, Greeley filed for record a warranty deed, dated May 5, 1870, from Evans to himself, of the premises, for an expressed consideration of $16,000, and on the same day trust deeds from him to Cline were recorded to secure $12,250, presumably a part of the purchase price.

The uncertainty of much that is in evidence concerning transactions prior to the great fire of October, 1871, in Chicago, is due to the circumstance that most of the docu-

mentary evidence that once existed in relation thereto, excepting such letters and papers as Evans had at his home, were destroyed in that conflagration; and the testimony of witnesses a quarter of a century later was, necessarily, faulty in many respects.

The deed from Evans to Greeley, in pursuance of the settlement that had been arrived at, was sent by Cline to Evans for execution under cover of a letter dated May 8, 1870, as follows:

"I here inclose the deed to be acknowledged, as I mentioned when I last saw you. Consideration I have $16,000 in deed; whether I may get it or not is the question; one-fifth cash, balance, one, two, three and four years, notes at seven per cent. I have strived hard to make sale, and will perhaps get one-half of the amount over $10,000. My partner, Phelps, has worked vigorously since I left last fall to make the sale to his friends, and I think has succeeded at last. You can acknowledge before county clerk at Springfield, as the party says he would rather have it done at the capitol. It makes no difference, I suppose; anything to please him, as he says it may give a better tone to the matter. The two deeds are all the same as you sent two years ago this fall. I will give them to you when you come here, or will send them to you by express, as you wish. Tell the madam to send me a sample of dress pattern, so that I may know the kind she wishes. Will send it by express to Elkhart. Be sure and acknowledge deed; send on as soon as possible, as the party may back out."

That letter of May 8th was followed by two letters from Cline to Evans, dated respectively, June 3, and June 4, 1870, which, with the inclosure for $7,500, were as follows:

Cline to Evans, June 3, 1870: "Yours received; in answer will state, the party I contracted with backed out, and in order to get the land cheaper, commenced suit against you and me. This old Baldwin is at the bottom of it, to make something out of you and me. Keep cool, do not give yourself any uneasiness and pay no $500 or nothing. I will be responsible for the sale; they can not

scare me nor you neither; sign nothing until I tell you what to do. I thought I had the matter closed, and you would have had the money by this time. I will send you the obligation at once. Answer no letters to lawyers. I told them I would not pay him until all was fixed, and not $500. He thought you would get scared and send the money. I paid him $250. He is to fix up all this. Baldwin has bothered me much in the sale of the land. Answer no letters. Will write you again. You are all safe.

P. S. I will send you the agreement of my own and all will be right. Do not be any way alarmed, as I will bring all right. All this is gotten up by old Baldwin, the man who wanted you to join in the ditching and draining. I give him a contract for commissions which he did not fulfill, and I signed a paper. He commenced suit to make money out of you and me, but I will beat him; only keep cool and say nothing about it, as it is humbug.

I here inclose my obligations, which will be paid when due, and do not mention to any one but that you own the land yet, and you really do until paid for, as it still stands in your name on the record, as I wish it to stand until I sell it."

Cline to Evans, June 4, 1870 : " I just received your letter last night on my return from Clark Station, and wrote you a few hurried lines in relation to the lawyer claiming $500 for fees. I told him I would not pay over $250. He took the privilege to write to you, supposing he might get it. They commenced suit against me about a year ago, and made you a party to the suit. This they can do, whether right or wrong, but they know they can't do anything; they only want to extort money out of us.

I will here explain the whole matter. Last spring two years ago, I gave to old Baldwin an agreement to sell the land for $12,000; $3,000 cash, balance in one, two and three years, interest at six per cent. During the fall of 1868 he brought a man around who offered a check of $3,000 provided I would give him the deed and take mortgage for balance. I told them to take the check to the

bank, and bring me the money, then I would give the deed. They did not come around for about a month after, and said, unless I would give them the deed for the same they offered, they would commence suit against the owner; and again, in the meantime I had made a contract with a man named Phelps, thinking that they had entirely backed out, but Phelps goes on and negotiates with another party for $14,000. After waiting a long time for the party to make the first payment he finally backed out. After the extension of the city limits, Baldwin and Greeley raised the $3,000, and tendered the money. I told them that I would not take less than $16,000, one fifth cash, balance in four years, interest at six per cent.

This they agreed to come up to, but finally backed out; still they did not discharge the suit, which suit does not amount to anything. I would have told you about it when there, but thought it of no consequence. I wish you would send me the affidavit Bellows sent you; also the letter, and if they do not take the land, I will instruct you what to do, and if necessary will send you the necessary affidavit to swear to; but Bellows tells me this morning he thinks they will take it on the terms they agreed upon; the trouble is, they can't raise the money, and if they do not soon, we will dissolve the injunction and throw them into the costs. You will have nothing to pay. I shall worry them out, and we will get all we can for the land, whether it is worth it or not. Give yourself no trouble about it, you are all safe; but you can help me out by saying, if required, you gave me the land to sell only during the month of May, 1868. As there is no one here knows anything about our arrangement, and as things are at present I do not wish them to know on any account, which would be a detriment to me in the suit, and it is highly necessary for you to know this part. Answer no letters in relation to the sale of the land to Bellows or any one else. I will work it all square if you will only stand by me. Until I make sale there is no necessity of your being here, even if the suit should go on; keep quiet and say nothing about the matter to any one, as I

mean to get all it is worth, and more if possible. These sharks here are not going to beat me very much, I will assure you, and I can't trust any of them."

The obligation referred to was as follows:

"Know all men by these presents that I, Geo. T. Cline, am justly indebted to David G. Evans for the sum of $7,500, payments to be made as follows, to wit:

$2,750.00 ......... July 1, 1870.
  3,000.00 .......... "    " 1871.
  3,250.00 .......... "    " 1872. Value received.

Witness my hand the 4th day of June, 1870."

We might quote many more letters, and recite many more circumstances, tending to show that Evans never claimed his probable right to terminate the contract he made with Cline on October 31, 1868, but on the contrary extended it and acted under it as being binding upon him up to the very last; that he always treated Cline as his debtor, and not Greeley; that he knew, or was bound with knowledge that Cline had sold the land for $16,000, and never claimed, as being his due or right, any more than the $10,000 mentioned in his contract with Cline.

It is quite certain that before Cline gave to Evans his obligation of June 4, 1870, to pay $7,500, with interest added in, all but that part of the $10,000 had been paid by Cline, and the inference is strong that from henceforward Evans never claimed any more from Cline than the amount of that obligation and interest.

It will be seen that $2,750 of that obligation was payable July 1, 1870. On the twenty-first of July, 1870, Cline wrote Evans requesting a modification of the obligation to the extent of extending the dates of payment at ten per cent interest, and there is nothing to show that Evans refused to assent to the extension.

Subsequent letters show that Cline sent to Evans in August, 1870, $1,500, in June, 1871, $2,500, and a claim March 4, 1872, that he had paid $500 besides, concerning all three of which payments Cline wrote Evans March 4, 1872, and asks for verification, because his books had been burned in the

fire. Again, there was found among Evans' papers a receipt to Cline for $1,500, under date of June 28, 1872, " as part payment for land purchased from me and situated"—describing the eighty acres. Letters of May 23, 1873, June 9, 1873, and June 17, 1875, show further payments by Cline aggregating $2,425.

We do not intend to be understood as saying that the letters of Cline to Evans exhibit straight-forwardness of dealing with, or representation to, Evans, but we quote and refer to them mainly for the purpose of showing, in part, the evidences that Evans had knowledge, or might have had knowledge by the exercise of such reasonable diligence as every ordinarily prudent man is chargeable with, of the entire situation, and that he was not imposed upon except by way of a tax upon his good nature and friendship.

It seems to us clear enough that Evans never departed from his intention, as expressed in the contract of October 31, 1868, to, as between himself and Cline, treat Cline as the purchaser of the land and as his debtor for it, at the price of $10,000, leaving to Cline all that he might make above that figure. It should be borne in mind that Cline was held to be incompetent as a witness to most matters in controversy, and that because of the destruction by fire of all his papers pertaining to the transactions that were had before October, 1871, and of the loss or destruction of his papers concerning subsequent transactions, when he removed to Maryland in 1883, his defense, so far as was permitted to him, was mainly confined to Evans' papers produced by the appellees.

It was offered to be proved by Cline that he and Evans had a final settlement in 1877 at the Tremont House, in Chicago, when, in consideration of a payment of about $800, made by Cline to Evans at that time, Evans gave Cline a receipt in full, which was lost when Cline removed to Maryland in 1883.

Now, if Evans had knowledge, as we think he did, of all of Cline's transactions with the land, and if such transactions might, for any reason known to him, have been

avoided by Evans, or he might have required Cline to account to him, yet having such knowledge during all the remaining years of his life, down to 1883, and doing nothing, he must be held to have acquiesced in them, even though he should not be held under the evidence to have expressly ratified them.

What bound Evans has necessarily bound his executors, the appellees, unless something to avoid the effect of such conclusion has come to the knowledge of the executors that Evans was not informed concerning.

All such matters as are relied upon to avoid such effect upon the executors, were facts which Evans was informed of, or put upon such inquiry concerning as was equivalent to knowledge, by the suit for specific performance begun by Greeley against him and Cline, and by the letters of his solicitor and Cline.

It would not have been permitted to Evans, if he had lived to the time when this suit was begun, to have avoided a plea of *laches* by saying that he did not know that Cline had previously sold the land for more than the price mentioned in the contract of October 31, 1868.

The knowledge that Evans acquired of the pendency of Greeley's suit for specific performance, bound him with knowledge of what the suit was about, or, at least, bound him to inquire concerning it, and if, having such knowledge and failing to inquire further, he chose, as he clearly did, to go on and perform under the contract he entered into with Cline, his executors can not, any more than he could, at this great lapse of time, come into equity and obtain an accounting from Cline for all that he obtained from Greeley.

The doctrine of *laches* has especial application to the case, but we do not need to cite authorities.

The decree is reversed, with directions to the Circuit Court to dismiss appellees' bill.